Filed 3/18/22  In re Nadia L. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re NADIA L., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MONICA R.,<br><br>    Defendant and Appellant. | G060601<br><br>(Super. Ct. No. 19DP1226)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

## INTRODUCTION

Monica R., the mother of minor Nadia L., appeals from an order of the juvenile court terminating her parental rights under Welfare and Institutions Code section 366.26.[1] Her sole issue on appeal is that she provided sufficient evidence to forestall termination under the parental-benefit exception of section 366.26, subdivision (c)(1)(B)(i). The court found that she had not met her burden of proof as to the first two elements of the exception – regular visitation and continuing benefit – and so did not make findings relating to the third element – detriment to the child.

We affirm the order. Monica's evidence supporting the exception was not uncontradicted and unimpeached, as it must be when an appellant disputes a trial court's finding that a party did not carry an assigned burden of proof. Of the three elements of the parental benefit exception, Monica failed to establish two: regular visitation and continuing benefit to the children.

## FACTS

Nadia was detained in October 2019 at age 10. She was initially detained from her father because of his substance abuse, but then, after Monica could not be located, Nadia was detained from her as well. At the time, Monica had active arrest warrants for violation of probation and an open case for possession of methamphetamine. There was also considerable confusion about which parent was the primary caretaker and responsible for Nadia.

Nadia was placed in Orangewood. In November 2019 she went to live with family friends in Huntington Beach.

Monica was in custody at the time of the jurisdiction/disposition hearing in November, so the court set visitation at twice a month. She was released from custody on December 16 and rearrested in February 2020. She did not visit Nadia while she was out

---

[1] All further statutory references are to the Welfare and Institutions Code.

of custody.  She and Nadia visited once in person while Monica was in jail, before Covid restrictions precluded in-person visits.

Monica was released from custody on March 27, 2020.  Nadia called her daily after her release, but could not reach her, increasing Nadia's anxiety.  Monica did not engage in case plan services, so the case worker could not liberalize visitation. Monica did not visit Nadia between the time of her release and early May.

At the end of April, Monica and the case worker discussed resuming visitation.  Nadia was in therapy at the time, and the case worker told Monica that Nadia's therapist had to be consulted regarding contact between the two.  The case worker told Monica that she should not resume contact with Nadia unless she could be consistent.  After discussions with Monica's foster mother and her therapist, two 30-minute phone calls were arranged for May 1 and May 2.  Monica did not call on either day.  Fortunately, Nadia had not been told of the phone calls ahead of time, so she was not disappointed when Monica failed to call.

In mid-May, Monica began phone calls with Nadia under certain guidelines.  The case worker began the process of arranging in-person visits; in the meantime, Nadia and Monica communicated via phone calls and video chats.

Monica entered an in-patient treatment program in May 2020.  After graduating from the program, she enrolled in an outpatient program, from which she was terminated after having a positive drug test.

Between June and November 2020, Monica was authorized to have one-hour in-person visits with Nadia on Fridays and Saturdays and 30-minute video chats Monday through Thursday.  The foster mother reported that the chats were going "okay," except that Monica kept using profanity and was making promises to Nadia about overnight visits.

Monica began in-person visits with Nadia in September 2020 and continued her telephone calls to Nadia four times a week.  In-person visits in September and early

October went well. Toward the middle of October, both kinds of visits began to decline. At the end of November, Nadia's foster mother spoke to the case worker about Monica's last-minute notices to change the time of in-person visits and her efforts to change the place. As a result, the case worker instituted a 24-hour confirmation rule. Monica had to confirm the visit no later than 24 hours in advance or the visit would be canceled. In addition, video visits were not going well because Monica and Nadia's half-brother, Aaron, who was allowed to visit with Monica, were often fighting. Monica repeatedly argued with the case worker about the 24-hour confirmation rule, which had been instituted because of her own tendency to change visits with little warning, and complained about the location of in-person visits, when she had been told that she could suggest another place.

In December 2020, Nadia's therapist told the case worker that Nadia was calling her foster parents "mom" and "dad." She did not talk much about visits with Monica, and the therapist opined that Nadia "does not recall the visits." Nadia said she did not know why Monica did not take care of her instead of leaving her with her abusive father.

Monica's reunification services were terminated on January 25, 2021. The permanent plan hearing was set for May 25. Monica was allowed three hours a week of in-person visits and 30 minutes of video visits four times a week. Funding for services was continued so long as Monica did not have a missed, positive, or diluted drug test and did not miss a counseling appointment.[2] The permanent plan hearing was continued to the end of July.

A summary of visits between late February and early May 2021 showed that the in-person and video visits were inconsistent. Monica often failed to confirm a visit 24 hours in advance, resulting in a cancelation. One in-person visit did not happen

---

[2]    This arrangement is known as a "soft .26."

4

because Monica said she "just woke up" and canceled, even though Nadia and her foster mother were already at the visit site. Nadia remarked that it saddened her that her mother "'couldn't even get up on time to make it to see her.'" The foster mother reported in March that Nadia seemed happier when the calls were missed and in April that visits had been "'patchy.'" Nadia also called Monica a "liar" owing to Monica's behavior regarding visitation. Monica continued to flout the 24-hour rule for visits, confirming late or not at all. Having failed to keep her side of the "soft .26" arrangement, she was terminated from drug testing and counseling.

The pattern of missed visits continued in July. Nadia was in camp for a week at the end of the month, and Monica was asked for her availability so visits could be increased to make up the missed days. She did not respond. During one video visit, Nadia had to ask Monica six times to pay attention to her. Monica also failed to contact Nadia's school to sign off on her individualized education program.

The stress of the impending court hearing caused Nadia to have a major breakdown in early July. She feared angering her parents and was reliving memories of sexual abuse that had occurred before her detention. Her foster parents were able to assist her to regain her composure. Nadia later expressed similar stress and panic regarding testifying at the hearing to her therapist.

The selection and implementation hearing started on July 30 and concluded on August 17, 2021. Nadia and Monica both testified, as did Monica's Alcoholics Anonymous sponsor and her case manager from a live-in treatment program.

Nadia completed her testimony on July 30 without incident and later expressed her relief that it was over. She also commented that she knew what the outcome of the hearing would be, because Monica had not been visiting, and said she agreed with the outcome. Nadia remained in the courtroom with the case worker during other testimony on that day and had two panic attacks while evidence of Monica's

5

substance abuse was being discussed. At the end of the court day, Nadia again expressed her relief and her happiness at going home with her foster parents.

The juvenile court terminated Monica's parental rights on August 17. The court held that Monica had not presented sufficient evidence to support application of the parental benefit exception to section 366.26. She had established neither regular visitation and contact nor benefit to Nadia from continuing the relationship outweighing the benefits of adoption. That being the case, the court did not address the third element of the exception, detriment to the child if the relationship was terminated.

## DISCUSSION

Section 366.26 provides the procedure for determining a dependent child's permanent placement. The statute *requires* the juvenile court to terminate parental rights if it finds the child is likely to be adopted *unless* one of the statutory exceptions applies. (§ 366.26, subd. (c)(1).)

One exception is commonly called the parental benefit exception. Even if the child is likely to be adopted, parental rights are not terminated if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child." To be eligible for this exception, the parents must "have maintained regular visitation and contact with the child," and they must show that "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parent carries the burden of proof of establishing the exception (*In re Breanna S*. (2017) 8 Cal.App.5th 636, 646, overruled on other grounds *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C*.), and it is a difficult burden to carry. "The exception requires the parent to prove both that he or she has maintained regular visitation and that his or her relationship with the child ""promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."" [Citations.]" (*In re Breanna S., supra,* 8 Cal.App.5th at p. 646.)

6

Our Supreme Court has recently decided a case, *Caden C.*, 11 Cal.5th 614, that deals in some detail with the parental benefit exception. As the court pointed out, deciding whether to terminate parental rights does not depend on whether the child will ever be reunited with the parent. In fact, if the dependency case gets as far as a section 366.26 hearing, it is highly unlikely the parent and child would be reunited. But potential reunification is not the criterion for applying the parental benefit exception. (*Id.* at pp. 630, 637, 638.) Moreover, the parent's failure to resolve the problems that led to dependency, such as drug use, does not in itself defeat the exception. (*Id.* at p. 637.)

The three elements to the parental benefit exception are (1) regular visitation, (2) a relationship that would continue to benefit the child, and (3) detriment to the child if the relationship is severed. (*Caden C., supra*, 11 Cal.5th at p. 631.) Throughout the inquiry, the focus must remain firmly on the child's best interest. (*Id*. at p. 632.) We review regular visitation and continuing benefit for sufficiency of the evidence. (*Id.* at pp. 639-640.)

Monica argues that she presented substantial evidence of consistent visitation to establish the first element of the parental benefit exception. But that is not the standard she must meet on appeal. "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a

7

character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds, *Conservatorship of O.B.* (2020) 9 Cal.5th 989 [mother did not present uncontradicted and unimpeached evidence to support parental benefit exception]; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 ["Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed."].)

In this case, the juvenile court had evidence, which it evidently credited, that Monica's visitation had not been regular.[3]  In fact, visitation was so inconsistent that the case worker had to institute a rule requiring Monica to confirm her visit 24 hours in advance.  Even so, Monica would confirm and then not show up for visits, causing Nadia "to . . . becom[e] upset or just sit[] there waiting."  Then the rule had to be tightened up to preclude "grace periods" (e.g., 23 hours in advance) because Monica was so lax about the 24-hour notification.  Even with these clear guidelines, Monica still missed many visits.  And Nadia testified about the results: initially she was "a little heartbroken," but eventually she got "used to it."  Toward the beginning of 2021, Nadia appeared to be benefiting from *not* visiting.  Even while the section 366.26 hearing was in progress – between the end of July and the middle of August – Monica was still missing visits.

Monica's evidence of regular visitation was not uncontradicted and unimpeached, leaving no room for a judicial determination of insufficiency.  It did not

---

3    Monica argues that the court was not provided with information about the *quality* of the visits that did take place, so the court did not have sufficient evidence upon which to base its finding.  The court did have information regarding the quality of some of the video visits – for example, the arguments that Monica and her son had during them, the profanity she used, and her occasional lack of attention to Nadia – but the first question the court asks is whether the visits have been "regular."  "Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.]" (*Caden C., supra,* 11 Cal.5th at p. 632.)  There must be a critical mass of visits to continue or develop this attachment.

compel a finding for her as a matter of law on this element of the parental benefit exception.

Monica also argues that the court abused its discretion by stopping at "regular visitation," instead of continuing on to assess the benefit of continuing the relationship and detriment to the child, the other two elements of the parental benefit exception.[4] The court did continue with the second element of the exception; it found that Monica did not occupy a parental role in Nadia's life.

The benefit that continuing the parental relationship confers on the child must not only exist, it must also outweigh the stability and security offered by adoption. "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."].) "A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. . . . [A]n emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's [*sic*] interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, fn. omitted.)

---

[4] Monica argues that the analysis should have been completed because Nadia "informed the court that she loved her mother more than her caregivers[.]" This is the actual testimony: "Q Is it fair to say you love your mom and you also love the Days [the foster family]? [¶] [Nadia] Yes. I love them both equally. Kind of. I love my mom a little bit more, obviously, because she's my birth mom. [¶] Q Can you trust your mom? [¶] [Nadia] Sometimes."

Given that Monica did not clear the first hurdle of the parental benefit exception – regular visitation – the court was not obligated to allocute reasons for its finding regarding the benefit of continuing the relationship. There was certainly considerable evidence that Monica was not a source of security and stability for Nadia and that their relationship was ambivalent.

The bottom line is that on appeal Monica must show the evidence presented to the juvenile court on this point was "uncontradicted and unimpeached." She has made no such showing.

Since Monica could not carry her burden to prove the first two elements of the exception, the court was not obligated to deal with the third element. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 412, fn. 9.)

**DISPOSITION**

The order terminating Monica's parental rights is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10